UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
Civil Division

PhantomALERT,                                   Jury Trial Demanded
  Plaintiff

v.

Apple, Inc.,
   Defendant

# COMPLAINT AND JURY DEMAND

Plaintiff PhantomALERT ("Plaintiff"), by and through its counsel, brings this action against the defendant named above (the "Defendant") and alleges the following based upon information, belief and the investigation of counsel:

## NATURE OF CASE

1. From 1984 to present, Apple, Inc. has evolved from a fledging computer company to a behemoth in the markets for smartphones and certain related products and services, the effect of which has been the suppression of competition and innovation.

2. At a market cap of over $2 trillion, Apple's size and reach far exceed those of any technology monopolist in history.

3. A major source of Apple's profits stems from the insatiable demand from purchasers of its iPhone smartphones and iPad tablets (collectively "Devices") for software applications ("apps"), such as for music, entertainment, movie, TV, messaging, games, email, photos/videos editing, camera, news, internet, notes, calendar, GPS-enabled maps, health monitoring, banking, and retail.

4. Apple develops many of its own apps and includes for sale through its own app store (the "App Store") thousands of apps from third-party developers.

5. Apple sells these apps to users of its Devices through the App Store.

1

6. This case concerns Apple's use of various restraints and monopolistic practices restricting iPhone and Apple tablet users in the U.S. to accessing apps on their devices only through the App Store, and not directly from the web.

7. The App Store is reportedly Apple's main source of profit. The key reason is that Apple prevents Apple device users from accessing apps directly from the web (a practice known as "sideloading"), thus coercively limiting them to access apps only through the App Store. At the same time, however, evidence shows the feasibility, practicability and even history of sideloading, both to the iPhone and Google/Android phones. Thus, for instance, in the first year after the 2007 introduction of the first iPhone, before Apple created the App Store, Apple Device users could download apps directly from developers' websites. Also, Google/Android, while limiting which apps it allows in its own app store, the Google Play Store, permits users of its devices to download apps directly from developer websites, albeit with constraints on developers' promotion of their apps. Furthermore, subsequent to the recent implementation of the Digital Markets Act ("DMA") of the European Union ("EU"), Apple is now required to allow its EU users to "sideload" apps directly from the web and has implemented changes to enable such users to do so (although now prompting widespread criticism as to alleged obstacles it has erected to their doing so).

8. In order to maintain profitability, Apple imposes unreasonable and pretextual restraints to exclude apps written by third-party developers such as Plaintiff, PhantomALERT, which it views or has viewed as potential competitors to itself for the subject of such apps, thus violating federal and state antitrust law and state unfair competition law.

9. Apple's anticompetitive conduct with respect to iOS app access results in sweeping harms to (i) app developers who are denied choice on how to distribute their apps (ii) Apple device

users, who are denied apps Apple bars from distribution except exclusively through the App Store, whereas sideloading has been shown to be feasible and successfully implemented by consumers.

10. This particular case involves an app developed to help consumers report, track, trace and map Covid-19 in their area. Since 2010, PhantomALERT, an app very similar to WAZE, a crowdsourced navigation app, has experienced a healthy demand on the App Store for displaying live traffic information, road hazards and other information to help drivers drive alert, safely and thus ticket free since 2010. The PhantomALERT' crowdsourced apps have been successful, enthusiastically embraced and used by drivers, and generating quality and reliable data while producing considerable revenue.

11. In March 2020, the Covid-19 pandemic exploded, deaths mounted, and world governments, medical experts, the media and the general public made a global call to action to tech companies to help fight the pandemic. In response, PhantomALERT's experienced team of developers and medical advisors retooled its existing crowdsourcing traffic app to help track, map and contain the global spread of Covid-19. Buildng on its over 12 years of experience in collecting valuable user-generated data from the global public via app technology, PhantomALERT modified its existing apps and submitted the revamped apps, now including Covid-19 symptom reporting, tracking, tracing and mapping features, to the Apple App Store and the Google Play store. The newly revamped PhantomALERT App ("App") now permitted Apple Device users from anywhere in the world to report Covid-19 symptoms, hot spots and incidence information by location, with the goal of raising awareness of Covid-19 spread, identifying hot spots and collecting valuable user-generated biostatic data to help contain the pandemic. The collected data was intended to be made

available to health officials, government agencies, scientists, virologists, epidemiologists, the media and the general public. PhantomALERT developed both iOS and Android-compatible Apps and submitted them to the Apple App Store and Google Play store in March 2020. In the same month, Google initially approved PhantomALERT's Covid-19 app.

12. However, Apple rejected PhantomALERT's Covid-19 tracking app, on the alleged grounds that it violated certain newly minted Covid-19 app guidelines for acceptance into the App Store. The new guidelines stated that any Covid-19 related app had to be submitted by recognized entities such as government organizations, health-focused NGOs, companies deeply credentialed in health issues, and medical or educational institutions. Apple stated that only Covid-19 related apps from developers from one of these "recognized entities" would be permitted on the App Store. On the basis of these guidelines, Apple then rejected PhantomALERT's Covid-19 app for acceptance into the App Store. The exact language of this rejection is set forth below:

> *From Apple*
> - *1. 4 Safety: Physical Harm*
> - *2. 1 Performance: App Completeness*
>
> *Hello Joe,*
>
> *Thanks for your time on the phone today.*
>
> *As discussed, your app has been rejected for guideline 5.1.1.*
>
> *It would be appropriate to remove the Virus Alert feature from your app.*
>
> *We're evaluating apps critically to ensure data sources are reputable and that developers presenting these apps are from recognized entities such as government organizations, health-focused NGOs, companies deeply credentialed in health issues, and medical or educational institutions. Only developers from one of these recognized entities should submit an app related to COVID-19.*
>
> *For additional detail, please refer to the news regarding Ensuring the Credibility of Health & Safety Information on the Apple Developer web site.*
>
> *We hope you will consider making the necessary changes to be in compliance with the App Store Review Guidelines and will resubmit your revised binary.*

13. Apparently, while banning apps like PhantomALERT, both Apple and Google were working together behind the scenes to monopolize the tech response to the Covid-19 Pandemic by collecting valuable pandemic-related data and information.

14. Apple revealed its true motivation a few days after rejecting PhantomALERT's Covid-19 app, when it launched its own Apple-branded Covid-19 app in collaboration with the Center for Disease Control ("CDC") and the White House. Soon thereafter, Apple launched another Apple-branded Covid-19 app geared towards first responders. Both of these Apple-branded Covid-19 apps had similar features to PhantomALERT's App and garnered millions of "installs" within days. In April 2020, Google also banned PhantomALERT's Android app on the grounds that Google had modified its Covid-19 app policy by imposing a blanket ban of Covid-19 apps. This newly Covid-related policy stated:

> We don't allow apps that lack reasonable sensitivity towards or capitalize on a natural disaster, atrocity, conflict, death, or other tragic event.

15. Even though the pandemic was raging, Google and Apple, within days of each other, each rejected the App. At least hundreds, if not more, app developers from around the world with similar app ideas and with the intent to help fight the global pandemic in their communities were denied access to global Apple and Android device users as a result of Apple's and Google's anticompetitive actions.

16. Furthermore, after banning PhantomALERT and other qualified app developers for Covid-19 related apps, in April 2020 Apple and Google, in a joint press conference, announced that they would be working together to create and deploy their own joint Covid-19 app.



17. PhantomALERT's Covid-19 app satisfied in substance all the requirements of Apple's guidelines for Covid-19 apps: among other respects, it was supervised and developed in conjunction with respected physicians, who, pursuant to the proposed app, would closely monitor and analyze the data reported by users and made available to governments, health officials, the media and general public.

18. Apple terminated its own Covid-19 app in November 2021 after receiving huge backlash from the app developer community alleging unfair and self-serving practices.

19. Apple/Google's joint venture. which amassed over 90 million installs initially, also fell apart in the summer of 2023 due to its complexity and low developer support.

20.  While Apple was banning simple, proven and credible apps like PhantomALERT's, it also began allowing apps on the Apple Store by developers who were in clear violation of Apple's own Covid-19 guidelines, thus evidently favoring certain apps which should have been rejected per Apple's own guidelines. Plaintiff PhantomALERT has been damaged proximately through the loss of access to Apple smartphone users for the collection of valuable user-generated Covid-19 data and sales it could have made through the App Store, and if not through the App Store than directly through consumer (i.e., individual and institutional) access to its App on the web.  This loss, and the resulting damage, occurred

particularly during the peak of the Covid-19 crisis, when data related to the pandemic was valued and sought after by governments, health professionals, the media and the general public. PhantomALERT herein seeks treble damages, attorney's fees, and injunctive relief.

## JURISDICTION AND VENUE

21. This Court has federal question jurisdiction pursuant to the Sherman Act, the Clayton Antitrust Act of 1914, 15 U.S.C. § 15, and pursuant to 28 U.S.C. §§ 1331 and 1337.

22. This Court has personal jurisdiction over Apple, as it derives substantial revenues via sales of its products within the jurisdiction from its own stores.

23. In addition, a substantial part of the actions which gave rise to the causes of action at issue occurred in this jurisdiction.

## THE PARTIES

24. Plaintiff PhantomALERT, Inc. is a Delaware corporation located in the District of Columbia. The inventor and CEO of PhantomALERT is Yoseph Seyoum, a resident of Maryland.

25. Defendant Apple, Inc. is an international purveyor of various electronic devices located in Cupertino, California and incorporated in the state of Delaware.

## FACTS

26. As of 2019, Apple had market share of about 60% of the US smartphone/tablet market.

27. Further, if purchasers of Apple devices wished to purchase apps they had no choice but to purchase through via the App Store.

28. Developers such as Plaintiff who wished to sell apps through the multi-billion dollar App Store had to sign a "Developer Agreement," in essence a contract of adhesion, as a prerequisite for submitting their apps for review by Apple for possible inclusion in the App

7

Store.

29. Since 2010, PhantomALERT submitted and obtained approval, multiple times, for its crowdsourced traffic app, named after the company.

30. On March 15, 2020, the threat of a global pandemic spread caused a shutdown of the world economy.  Consumers were in dire need of information and data about the virus, including symptoms, hotspots, testing sites, CDC guidelines and rate of spread.

31. PhantomALERT developed a "Covid-19 reporting, tracking, mapping and tracing" app, through which users could self-report COVID-19 symptoms voluntarily, with the intent to share this data with entities like the CDC, FEMA, Johns Hopkins University, scientists, epidemiologists, virologists, NGOs, government agencies, end users and the media to predict infection clusters, raise awareness and provide credible Covid-19 information. Promotional efforts included TV ads, PR campaigns, SEO, social media marketing, online marketing and partnerships highlighting the app's vital role in public health.

32. Despite PhantomALERT providing sample data and documentation identifying credible data sources, such as Johns Hopkins University, Center for Disease Control ("CDC") and World Health Organization ("WHO") Covid-19 data, Apple first cited concerns about PhantomALERT's Covid-19 user-generated data sources, health information reliability and guidance during a national health crisis and refused to approve the app.

33.  Further, on March 14, 2020, Apple introduced new App Store Review Guidelines:

> To help fulfill these expectations, we're evaluating apps critically to ensure data sources are reputable and that developers presenting these apps are from recognized entities such as government organizations, health-focused NGOs, companies deeply credentialed in health issues, and medical or educational institutions. Only developers from one of these recognized entities should submit an app related to COVID-19. Entertainment or game apps with COVID-19 as their theme will not be allowed.

34. These guidelines aimed to restrict independent developers and exert control over user-generated COVID-19 data. Apple mandated that only developers from "recognized entities" could submit COVID-19-related apps. The guidelines aimed to regulate/censor COVID-19related apps and notably restricted independent developers from contributing to the collection and dissemination of user-generated COVID-19 data.

35. Consistent with these guidelines, on or about March 25, 2020, Apple informed Mr. Seyoum that it rejected the PhantomALERT app.

36. Entities with no software app development experience were allowed to hire developers and then deploy Covid-19 related apps, whereas qualified and seasoned app developers like PhantomALERT and others with over decades of experience in building reliable, proven, complicated apps, collecting, curating and licensing user generated data were banned from helping fight the pandemic via access to Apple Device users.

37. Apple's stringent requirements appear to have been based on its plans to launch its own Covid-19 apps and to favor a joint venture with Google for a Covid-19 app.

38. A Google/Apple joint venture was announced in April 2020.

39. After much delay, while the pandemic was raging and causing millions of deaths, in or about May 2020 Apple and Google released their joint Covid-19 app.

40. While promoting its own Covid-19 apps and Apple/Google joint Covid-19 apps, Apple was also allowing apps on the App Store which violated its own Covid-19 Guidelines.

41. Apple's Covid-19 apps achieved millions of downloads from March 2020 until November 2021. In November 2021, Apple, due to complaints and scrutiny over self-favoring its own Covid-19 apps, removed them. However, other Apple-favored apps, such as the Indian government-backed mobile app Aarogya Setu, launched in April 2020 (and developed by a

former Google executive), garnered 50 million downloads in just 13 days amid the pandemic, making it one of the fastest apps to hit 50 million installs in a very short time. In the meantime, Apple denied PhantomALERT access to global customers.

42. Similarly, Zoe, a private app developed by "a health science company working in partnership with doctors and scientists at King's College London," experienced significant growth and employed user-generated data to uncover the correlation between Covid-19 symptoms and the loss of smell. Zoe's findings were instrumental in the early days of the pandemic, demonstrating the power of user-generated data.

43. Unlike PhantomALERT, neither Apple, Zoe, nor Aarogya Setu had years of experience in developing apps that collect user-generated data. Moreover, PhantomALERT had marketing, PR and investor support which could have resulted in significant success, and thus benefits to the public, but for Apple's interference.

44. Apple "new" restrictions in March 2020 were misguided, self-serving and suppressed legitimate competition from PhantomALERT and similarly situated developers.

45. As a result of Apple's conduct, Plaintiff has suffered damages in the form of lost profits and seeks reimbursement of same, trebled, as well as injunctive relief.

## Count One
## Violation of the Sherman Act, 15 U.S.C. Section 1
## Unreasonable Restraint of Trade -- Tying

46. Plaintiff incorporates the allegations of paragraphs 1 through 45 as though fully set forth herein, and alleges further:

47. At all relevant times, Apple had market power in the overall market for smartphones and tablets, and monopoly power in the market/s for the iPhone and its own tablets.

48. Consumers have demonstrated and continue to demonstrate separate demand for the iPhone (and the iPad), on the one hand, and, on the other hand, access to apps on these devices, i.e., not exclusively through the App Store. For instance, as previously explained, (a) Apple sold the iPhone separately for a year after it was first launched , (b) Google permits its customers to sideload apps, with no apparent negative consequences for Android devices, and (c) subsequent to the recent implementation of the DMA of the EU, Apple is now required to allow its EU users to "sideload" apps directly from the web and has implemented changes to enable such users to do so. Consequently, the iPhone/iPad constitute tying products and the App Store, the exclusive means through which consumers may obtain access to apps, constitutes a tied product (as a service). In this sense, the tied product/service may be analogized to a toll road for which Apple, as gatekeeper, sets the tolls and decides who may use it to reach its Device users.

49. Apple forces users of Apple's devices to acquire apps exclusively through the App Store, preventing any "sideloading," such as permitted by Android Phones. Apple thus coerces purchasers of the tying product Devices to accept the App Store as the exclusive means to obtain apps on their Devices.

50. Apple's tying conduct at all relevant times has had a competitive effect on a not insubstantial amount of commerce in the tied product/service, inasmuch as Apple completely controls access to the App Store as gatekeeper charging commissions to consumers via the app developers, and suppressing commerce from app developers excluded from the App Store.

51. Apple had a financial interest at all relevant times in the tied product market (as a service), that is, Apple's exclusive access for consumers to apps via the App Store.

52. Apple's tying of these two products lacks sufficient business justification, as evidenced in part by its pretextual justifications for restrictions of Covid-19 related apps permitted on the App Store, in addition to lacking legitimate justification for denying Device users access to apps directly from the web..

53. As a result of the foregoing tying conduct, PhantomALERT has suffered antitrust injury.

## Count 2
### Violation of the Sherman Act, 15 U.S.C. Section 2
### Monopolization of Access to Apps on Apple Devices

54. Plaintiff incorporates the allegations of paragraphs 1 through 45 as though fully set forth herein, and alleges further:

55. Apple has market power for smartphones and tablets. Apple has monopoly power over access to its own Devices.

56. Apple Device users are constrained from switching to non-Apple devices by virtue of the multiplicity of Apple products and services they use, high switching costs, and resulting "lock-in" effect within what is commonly described as Apple's "walled garden."

57. At all relevant times, Apple has monopolized consumers' access to apps on Apple Devices, including PhantomALERT, both (a) by imposing pretextual requirements for access to apps through the App Store and (b) by denying Apple Device users access to apps on their devices outside of the App Store, i.e., directly from the web. In these ways, Apple is engaged in unlawful monopoly maintenance. (Notably, in contrast, Apple allows consumers of its desktops and notebooks to download third-party apps without significant restriction.)

58. Such monopolization has caused and continues to cause antitrust injury to Plaintiff.

## Count 3
### Violation of The Cartright Act, California Bus. & Prof Code Sections 17200 et seq.

59. Plaintiff incorporates the allegations of paragraphs 1 through 45 as though fully set forth herein, and alleges further:

60. Apple's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq., which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. *See* §§ 16720, 16726.

61. Under the Cartwright Act, a "combination" is formed when the anticompetitive conduct of a single firm coerces other market participants to involuntarily adhere to the anti-competitive scheme.

62. Apple's anticompetitive conduct, as described above, compels app developers including PhantomALERT, to adhere involuntarily to Apple's anticompetitive scheme.

63. These challenged provisions have no legitimate or pro-competitive purpose or effect, and unreasonably restrain competition in the relevant markets.

## Count 4
### Violation of California's Unfair Competition Law
### Cal. Bus. & Prof. Code § 17200

64. California's Unfair Competition Law ("UCL") prohibits business practices that constitute "unfair competition," which is defined, in relevant part, as "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Each of these descriptions provides a separate "variety" of unfair competition. Thus, "a practice may be deemed unfair even if not specially proscribed by some other law" and even if not violating

13

an antitrust statute. *See Cel- Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180, 187 (1999).

65. The UCL permits claims to be brought by any "person," which includes "natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons." Cal. Bus. & Prof. Code §§ 17201, 17204.  To bring a claim under the UCL, a plaintiff must "(1) establish a loss or deprivation of money or property sufficient to quantify as injury in fact, i.e., economic injury, and (2) show that the economic injury was the result of, i.e., caused by, the unfair business practice." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322 (2011) (emphasis in original); see also Cal. Bus. & Prof. Code § 17204.

66. Apple's conduct, as described above, violates California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq., which prohibits any unlawful, unfair, or fraudulent business act or practice.

67. PhantomALERT has standing to bring this claim because it has suffered injury in fact and lost money as a result of Apple's unfair competition, as described above.

68. Apple's conduct violates the Sherman Act and the Cartwright Act, and thus constitutes unlawful conduct under § 17200.

69. Apple's conduct is also "unfair" within the meaning of the Unfair Competition Law.

70. Apple's conduct harms PhantonALERT which, as a direct result of Apple's anti-competitive conduct, is unreasonably prevented from freely distributing its Covid-19 Apps.

71. Apple's previously described conduct has no legitimate or pro-competitive purpose or effect, and unreasonably restrains competition in the relevant market.

72. PhantomALERT seeks injunctive relief under the Unfair Competition Law.

## Count 5
## Breach of Contract

73. Plaintiff incorporates the allegations of paragraphs 1 through 45 as though fully set forth herein, and alleges further:

74. In California, "[t]he elements of a cause of action for breach of contract are: (1) the contract, (2) plaintiff's performance or excuse for non-performance, (3) defendant's breach, and (4) the resulting damages to plaintiff." *Coles v. Glaser*, 2 Cal. App. 5th 384, 391 (2016) (internal quotation marks omitted).

75. "[u]nder California law, a written agreement may be modified by the parties' conduct, even if the written agreement includes a clause expressly prohibiting modification." *Alvarado Orthopedic Rsch., L.P. v. Linvatec Corp.*, No. 11-CV-246-IEG RBB, 2013 WL 2351814, at *4 (S.D. Cal. May 24, 2013) (emphasis added).

76. On March 14th 2020, Apple modified the Agreement by adding the SAFETY GUIDELINES, which required that Covid-19 Apps originate from "recognized entities such as government organizations, health-focused NGOs, companies deeply credentialed in health issues, and medical or educational institutions." Apple, Ensuring the Credibility of Health & Safety Information, Mar. 14, 2020, *https://developer.apple.com/news/?id=03142020a.* "Only developers frOm one these recognized entities should submit an app related to COVID-19."

77. In response, on March 16, 2020, Plaintiff uploaded the new "binary" version of PhantomALERT. Prior to uploading, Plaintiff checked the box affirming the application of the Safety Guidelines.

15

78. Apple's subsequent conduct created a breach of this contract, and Plaintiff was proximately damages.

**PRAYER FOR RELIEF**

WHEREFORE, as to Counts 1-3 of the Complaint, Plaintiff asks this court to award:

actual damages, trebled, for Plaintiff and attorneys fees

As to Countr 5 actual damages,

for all counts, an injunction against the Defendant's' violations of federal and state competition law; and

any other relief this Court deems just and proper.

                                        Respectfully Submitted

                                        *Thomas C. Willcox*
                                        Thomas C. Willcox, Attorney at Law
                                        DC Bar No 445135
                                        1701 16th Street, N.W
                                        Suite 211
                                        Washington DC   20009
                                        Tel: 202.239.2762
                                         202.234.0892
                                        thomaswillcox@willcoxlaw.com.co