**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **PHANTOMALERT**, <br><br> Plaintiff, <br><br> v. <br><br> **APPLE, INC.,** <br><br> Defendant. | Case No. 1:24-cv-00786 (TNM) |

**<u>MEMORANDUM OPINION</u>**

PhantomALERT accuses Apple, Inc., of various antitrust violations, in defiance of the Sherman Antitrust Act and California's Cartwright Act. It also argues Apple had breached California's Unfair Competition Law (UCL). Apple moves to dismiss. Rather than opposing that motion, PhantomALERT seeks leave to file an Amended Complaint.

The Court will grant the motion to dismiss as conceded. And it will deny the motion to amend as futile. PhantomALERT cannot resurrect its faulty antitrust allegations because the Amended Complaint stumbles at step one—it fails to adequately define the relevant market. More, PhantomALERT's unfair competition claim remains unworkable. Though PhantomALERT pursues injunctive relief for its UCL allegation, it fails to adequately plead the prerequisites for equitable relief. Thus, the proffered amendments do nothing to resuscitate the dismissed complaint.

**I.**

Plaintiff PhantomALERT is an app developer. For about a decade, PhantomALERT was content to operate an eponymous traffic app decently popular with drivers. Compl., ECF No. 1, ¶ 10. But when the COVID-19 pandemic erupted, the developer spotted an opportunity. It

"retooled its existing crowdsourcing traffic app to help track, map, and contain the global spread" of the virus.  Compl. ¶ 11.  The "newly revamped" app would permit smartphone users to report symptoms and hot spots by location to help choke off the pandemic.  Compl. ¶ 11.  And it would (hopefully) reap a profit for PhantomALERT.  Compl. ¶ 45.

But PhantomALERT's aspirations would quickly be thwarted.  Google initially accepted the app for distribution on the Google Play store but then reversed course, deciding it would not "allow apps that lack reasonable sensitivity towards or capitalize on a natural disaster."  Compl. ¶ 12, 14.  Apple also rejected the app, as Apple's new COVID-era guidelines required any virus-related app to be submitted by recognized entities such as "government organizations, health-focused NGOs, companies deeply credentialed in health issues, and medical or educational institutions."  Compl. ¶ 12.  Meanwhile, Apple developed its own COVID-related app alongside the Center for Disease Control and the White House.  Compl. ¶ 14.  Apple also partnered with Google to release COVID-19 tracing technology.  Compl. ¶ 16.  And Apple permitted certain independent apps that complied with the guidelines on the App Store.  Compl. ¶¶ 41–42.

PhantomALERT thought it caught a whiff of something underhanded.  It suspected Apple was fixing the market to promote its own products and shut out competitors.  So it brought this suit against Apple.  It brings claims under the Sherman Antitrust Act, alleging Apple unreasonably restrained trade and monopolized app access.  Compl. ¶¶ 46–58.  It also brings a few state-law challenges, insisting that Apple violated California's Cartwright Act and Unfair Competition Law.[1]  Compl. ¶¶ 59–72.

---

[1] PhantomALERT initially brought a claim for breach of contract but has since abandoned that claim.  Reply Supp. Mot. Amend, ECF No. 25, at 12.

Apple moves to dismiss. Mot. Dismiss, ECF No. 13. It argues that PhantomALERT's antitrust claims fails on multiple grounds, including the failure to adequately define the relevant markets, a lack of antitrust standing, the absence of concerted action, and a lack of anticompetitive behavior. Mot. Dismiss 2. And it insists that the state unfair competition challenge fails as a matter of law, as the claim is fully derivative of the flawed antitrust claims, fails to establish that a legal remedy was inadequate, and does not apply extraterritorially. Mot. Dismiss 2–3.

PhantomALERT moved for an extension of time to reply to the motion to dismiss, which the Court granted. Mot. Extension Time, ECF No. 16; Minute Order 06/20/2024. But then, rather than opposing that motion, PhantomALERT purported to file an Amended Complaint. Amend. Compl., ECF No. 17. Apple argued in response that PhantomALERT was not permitted to amend its complaint without leave of the Court, as more than 21 days had elapsed since Apple sought dismissal. Reply in Supp. Mot. Dismiss, ECF No. 18, 1–2. So the "purported Amended Complaint [was] therefore a nullity." Reply in Supp. Mot. Dismiss 2. Apple was correct—a plaintiff may only file an amended complaint without leave of the court no later than 21 days after service of a motion to dismiss. Fed. R. Civ. Pro. 15(a)(1)(B). Because PhantomALERT's clock had run on amending its complaint as a matter of course, it was required to seek leave of the Court to do so.

Taking the hint, PhantomALERT now moves to file the Amended Complaint with permission of the Court. Mot. Amend, ECF No. 20. It argues that its Amended Complaint was filed only "seven minutes late" and thus moves to have it considered timely filed "under the doctrine of excusable neglect." Mot. Late File Amend. Compl., ECF No. 21, at 1. In other words, PhantomALERT believes that the Amended Complaint suffices as responsive pleading to

Apple's motion to dismiss. Because the Amended Complaint was only filed minutes after the deadline for its (extended) response to Apple's motion to dismiss, PhantomALERT argues it should be retroactively labeled timely by the Court.

Apple disagrees. It insists that an amended complaint can never be a proper response to a motion to dismiss. And therefore, according to Apple, the Amended Complaint was filed *weeks* late, not minutes late. Response Br., ECF No. 24, at 1. So Apple contends that PhantomALERT's protestations of "excusable neglect" are beside the point. And it argues that its dismissal motion should therefore be granted as uncontested.

Alternatively, PhantomALERT files a standard motion to amend pursuant to Federal Rule of Civil Procedure 15(a)(2). Mot. Leave File Amend. Compl., ECF No. 20, at 1. Apple opposes this request. Def.'s Mem. Opp'n, ECF No. 22.

That leaves the Court with these motions: (1) a motion to dismiss the original complaint and (2) a motion to amend the complaint. Both are now ripe for resolution.

**II.**

Apple moves to dismiss PhantomALERT's Complaint under 12(b)(6). Mot. Dismiss 3. So the Court assumes the truth of all nonconclusory facts alleged in PhantomALERT's Complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). It then asks whether those facts "state a claim to relief that is plausible on its face." *Id*. And under Local Civil Rule 7(b), the Court may treat unopposed motions as conceded. LCvR 7(b); *see also Cohen v. Bd. of Trustees of the Univ. of the D.C.*, 819 F.3d 476, 480 (D.C. Cir. 2016).

Federal Rule of Civil Procedure 15 governs amendment of a complaint. In general, a plaintiff may amend his complaint with leave of court "when justice so requires." Fed. R. Civ. P. 15(a)(2). This is a "liberal standard," and leave to amend should be "freely give[n]." *Firestone*

*v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996); Fed. R. Civ. P. 15(a)(2).  Still, there are some narrow circumstances under which a court may deny leave to amend: where the motion was unduly delayed or is futile.  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  Amendment is futile where the updated complaint would not survive a motion to dismiss, meaning it lacks "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Hall & Assocs. v. Env't Prot. Agency*, 956 F.3d 621, 630 (D.C. Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678).[2]

### III.

Start with the motion to dismiss.  Under Local Civil Rule 7(b), an opposing party has 14 days to "file a memorandum of points and authorities in opposition to [a] motion [to dismiss]."  If the party misses that deadline, "the Court may treat the motion as conceded."  LCvR 7(b).  Apple moved to dismiss the complaint on June 6, 2024.  To date, PhantomALERT has yet to file an opposition.  An amended complaint does not count.  *See Barnes v. District of Columbia*, 42 F. Supp. 3d 111, 116 (D.D.C. 2014); 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1348 (4th ed 2024).  True, a timely filed amended complaint as of right can moot out a pending motion to dismiss the original complaint.  But for such a pleading to be

---

[2] PhantomALERT argues at length that the D.C. Circuit applies a misplaced standard to determine whether an amendment would be futile.  Reply Supp. Mot. Amend 3–10.  Specifically, it contends that it is illogical to apply the same standard to a motion to amend that the Court applies to a motion to dismiss.  *Id.* at 5 ("[T]he Rule 12(b)(6) . . . standard invoked by the courts for evaluating motions under Rule 15(a)(2) exists in tension with the need for fuller briefing than typically available at this stage of a case, so that it would be manifestly unjust . . . to deny the plaintiff the right to amend unless the case for futility is patently obvious.").  At the same time, though, PhantomALERT admits that "[i]t is correct that courts in this district and beyond typically invoke the standard governing motions to dismiss under Fed. R. Civ. Pro. 12(b)(6) for assessing the futility or non-futility of a motion for leave to amend under Rule 15(a)[(2)]."  *Id.* at 3.  In short, PhantomALERT has qualms with a clear principle of law that constrains this Court.  But regardless of the propriety of PhantomALERT's arguments for a law review journal, they carry little weight in a court bound by vertical stare decisis.

considered timely filed, it must be made 21 days after service of the motion to dismiss.  Fed. R. Civ. Pro. 15(a)(1)(B).  PhantomALERT purported to file the present Amended Complaint roughly five weeks after service of Apple's motion to dismiss.  *Compare* Mot. Dismiss (filed June 5, 2024) *with* Amend. Compl. (filed July 11, 2024).  So the Amended Complaint could not be filed as of right and moot out the pending motion.

Sure, the Court had offered PhantomALERT an extension of time to file a *response* to the motion to dismiss.  *See* Minute Order 06/20/2024.  But the Court did not give, nor did PhantomALERT seek, an extension of time to file an amended complaint as of right.  *Id.*; s*ee also* Minute Order 07/26/2024 (noting that the granted extension of time "did nothing" to extend the deadline for amendment as a matter of course).  And even if the extended deadline could somehow be construed to extend the deadline for filing an amended complaint without leave of the Court, PhantomALERT *still* missed that deadline.  Mot. Late File Amend. Compl. at 1 (acknowledging the filing was past the extended deadline for the motion to dismiss opposition).

Thus, PhantomALERT never filed a proper response to the motion to dismiss.  Nor did it file a timely amended complaint that would moot out the motion.  The Court will therefore grant the motion to dismiss as conceded.  *Cohen*, 819 F.3d at 480.  But the Court dismisses the Complaint without prejudice.  *Firestone*, 76 F.3d at 1209 ("A dismissal *with prejudice* is warranted only when a trial court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.") (cleaned up).

That leaves the motion to amend.  For the reasons below, the Court finds that granting PhantomALERT leave to file the Amended Complaint would be futile.  Despite various revisions, none of the five counts states a plausible claim for relief.  The Court starts with the antitrust claims before moving to the state law unfair competition allegation.

**A.**

First, the antitrust claims.  This bucket includes the allegations under the Sherman Act and the Cartwright Act—counts one through four.  Before venturing into PhantomALERT's specific claims, an overview of the statutory background is warranted.

The Sherman Antitrust Act was enacted in 1890 "against a background of perceived cartelization and monopolization of the American economy."  Richard Posner, *Antitrust Law* 33 (2001).  The Act consists of two main interdictions.  Section 1 condemns *concerted* action, prohibiting contracts, combinations, and conspiracies in restraint of trade.  15 U.S.C. § 1. Specificity is key, here.  A Section 1 complaint must allege sufficient factual matter to suggest that an agreement was made.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 566 (2007).  Merely invoking terms like "conspiracy" and "agreement" is not enough.  *Freedom Watch, Inc. v. Google, Inc.*, 368 F. Supp. 3d 30, 37 (D.D.C. 2019).  A "district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed."  *Twombly,* 550 U.S. at 558.

Section 2 prohibits *independent* action, forbidding monopolization, conspiracies, and attempts to monopolize.  15 U.S.C. § 2; *see also Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 767 (1984) ("The Sherman Act contains a basic distinction between concerted and independent action.") (cleaned up).  Altogether, the Act was "designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade" and "rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress."  *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958).

The Cartwright Act is a California law modeled after the Sherman Antitrust Act. *Mailand v. Burckle*, 20 Cal. 3d 367, 376 (1978). It broadly repudiates combinations to restrain trade, fix prices or production, or lessen production. Cal. Bus. & Prof. Code § 16720. Analysis under the Cartwright Act "mirrors the analysis under federal law" and thus "Sherman Act decisions are applicable to cases under the Cartwright Act." *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001); *Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1369 (Fed. Cir. 2002).

PhantomALERT brings a few different claims under both statutes. First, it insists that Apple flouts Section 1 of the Sherman Act by unreasonably confining iPhone users to the App Store rather than permitting them to download (or "sideload") apps directly from the web. Amend. Compl. ¶ 74. According to PhantomALERT, by forcing iPhone users to use the App Store, Apple is engaging in an illegal "tying" arrangement. Amend. Compl. ¶ 76; *see also Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 31 (2006) (describing an unlawful tying arrangement as when "a seller conditions its sale of a patented product (the 'tying' product) on the purchase of a second product (the 'tied' product)").

Next, PhantomALERT claims that Apple has unlawfully maintained a monopoly over app access, in violation of Section 2 of the Sherman Act, by "locking in" consumers to iPhones and rendering them unable to "switch to alternative access to apps," all the while "imposing pretextual, inconsistent and discriminatory requirements for access to apps through the App Store." Amend. Compl. ¶¶ 82, 84. It also insists that Apple has maintained an unlawful monopoly over the "submarket of access to COVID-19-related tracing apps." Amend. Compl. ¶ 87. Finally, it alleges that the same conduct undergirding Apple's Sherman Act violations constitutes an infringement of California's Cartwright Act. Amend. Compl. ¶ 94. It aims to

certify a class in relation to these complaints, insisting that Apple's anticompetitive practices have similarly harmed "[a]ll developers of COVID-19-related apps."  Amend. Compl. ¶ 69.

All these challenges founder for the same threshold reason.  PhantomALERT has failed to adequately lay the cornerstone of any antitrust case: the relevant market.

The importance of a well-defined market for an antitrust allegation cannot be overstated. *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957); *Bathke v. Casey's Gen. Stores, Inc.*, 64 F.3d 340, 345 (8th Cir. 1995) ("Antitrust claims often rise or fall on the definition of the relevant market.").  Without an understanding of the bounds of the relevant market, a court cannot determine whether the defendant has unlawfully "lessen[ed] or destroy[ed] competition."  *Coronavirus Reporter v. Apple*, 85 F.4th 948, 955 (9th Cir. 2023) (cleaned up).  That is:  without knowing whom the defendant should be competing against, the Court cannot determine whether it has engaged in anticompetitive behavior to wrongly increase its market power relative to those competitors.  Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 501 (5th ed., 2023) (hereinafter Areeda & Hovenkamp).  The spectrum of competitors, in turn, is defined by the full slate of firms from which a consumer can acquire her desired good.  *Id.* ¶ 530a.

In perfect competition, these firms are price-takers—that is, they all charge the same price, since any drop in price would lead their competitors to do the same and any increase in price would drive their customers next door.  *Id.* ¶ 501.  Theoretically, though, if every firm from which a consumer could obtain her desired good banded together to charge a supracompetitive price, the consumer would have to pay that inflated price.  There would be nowhere else for her to turn.

This thought experiment reveals the relevant market for antitrust law.  That is, a market is "any grouping of sales whose sellers, if unified by a hypothetical cartel or merger, could profitably raise prices significantly above the competitive level."  *Id.* ¶ 533b; *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).  The burden is on the plaintiff to identify this sliver of the global economy.  If the plaintiff fails to meet that burden, its complaint must be dismissed.  *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436–37 (3d Cir. 1997); *Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.*, 55 Cal. App. 5th 381, 413–14 (Cal. Ct. App. 2020) (same under California's Cartwright Act).

Defining the market is a bipartite endeavor.  The relevant market as a whole consists of two aspects: the product market and the geographic market.  *E. I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 441 (4th Cir. 2011).  The relevant product market is defined by the cross-elasticity of demand between the good at issue and substitutes for the good.  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).  Cross-elasticity of demand, in turn, "look[s] to the availability of products that are similar in nature or use and the degree to which buyers are willing to substitute those similar products for one another."  *F.T.C. v. H.J. Heinz Co.*, 246 F.3d 708, 718 n.15 (D.C. Cir. 2001).  This measure is key, as "the ability of consumers to turn to other suppliers restrains a firm from raising prices above the competitive level."  *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986).  In plain terms: The product market is defined by the good at issue and any other goods that a consumer would sub in if the good at issue were to get more expensive.  Courts use this measure because the power of consumers (or lack thereof) to buy substitute goods when prices rise reflects a firm's inability (or ability) to restrain competition.

The second half of market definition concerns its geographical limits.  This inquiry "focuses on that geographic area within which the defendant's customers who are affected by the challenged practice can practicably turn to alternative supplies if the defendant were to raise its prices or restrict its output." *Kolon Industries*, 637 F.3d at 441.  In other words, *where* can a consumer reasonably turn to purchase a substitute good?  *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961).  An antitrust plaintiff must plausibly allege the actual boundaries of the market, lest its complaint be doomed.

Here, PhantomALERT has failed to plausibly allege both elements of market definition.  Start with its attempts to specify the relevant products.  Though a bit difficult to parse, the Amended Complaint appears to present three different product markets: "smartphones," in general; the Apple-specific "App Store," an "aftermarket" to the smartphone foremarket; and "COVID-19-related tracing apps," a "submarket" of the App Store.  Amend. Compl. ¶¶ 15, 82, 87; Reply Supp. Mot. Amend 11.  All these product markets fail for different reasons.

First, the smartphone market.  PhantomALERT's allegations consist of copy-and-pasting language from a Justice Department antitrust complaint against Apple in a different matter.  Amend. Compl. ¶ 15.  Putting aside the propriety of such a practice, *see Yellen v. U.S. Bank, Nat'l Ass'n*, 301 F. Supp. 3d 43, 49 (D.D.C. 2018), this market misfires because it is not the *relevant* market—that is, it is not the market from which PhantomALERT's asserted harms derive.  *See* Areeda & Hovenkamp, *supra*, at ¶ 533c (noting that the "relevant market" in an antitrust case is "a market relevant to the particular legal issue being litigated.").  PhantomALERT is not a competitor in the smartphone market.  It is an app developer.  So Apple's alleged power in the smartphone market is at best tangential to the injuries that

PhantomALERT alleges.  *See Bhan v. NME Hosps., Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985) ("[T]he injured party [must] be a participant in the same market as the alleged malefactors.").

Another way to say this is that PhantomALERT has not suffered an "antitrust injury" in the smartphone market.  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  Even if all PhantomALERT's assertions were true, it would not have suffered any injury in the *smartphone* market that "flows from that which makes [Apple's] acts unlawful" or "reflect[s] the anticompetitive effect" of Apple's antitrust violations.  *Id.*  That is because PhantomALERT, as an app developer, has suffered no injury in the smartphone market.  In other words, there is a mismatch between the market allegedly controlled by Apple and the market where PhantomALERT is allegedly injured.  So the purported "smartphone market" is better left for the DOJ complaint against Apple.  *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1057 (9th Cir. 1999) ("Antitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained.").

PhantomALERT's attempts to bundle the smartphone market with the App Store "aftermarket" fails, too.  PhantomALERT tries to define an incredibly narrow market, consisting of just one supplier—Apple.  Typically, the relevant product market in an antitrust case must consist of more than a single brand.  *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 343 (E.D.N.Y. 2019) ("It is an understatement to say that single-brand markets are disfavored.  From nearly the inception of modern antitrust law, the Supreme Court has expressed skepticism of single-brand markets.").

There is a limited exception to this rule.  As established by the Supreme Court in the *Kodak* case, an antitrust plaintiff can allege a single-brand aftermarket consisting of a secondary good that "must be used for the proper functioning of some primary good."  Areeda &

Hovenkamp, *supra*, at ¶ 564b; *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992). For instance, if an owner of a particular product can only buy replacement parts from the product manufacturer, the replacement parts may constitute a relevant aftermarket. *See Kodak Co.*, 504 U.S. at 482. An antitrust plaintiff could plead a plausible claim for relief if it can show that a producer has unreasonably restrained trade in or monopolized such a *Kodak*-style aftermarket.

But PhantomALERT's attempt to cast the Apple App Store as an aftermarket to the smartphone foremarket fails. The *Kodak* approach is concerned with a producer charging "supracompetitive" prices to "locked-in" consumers, who could not foresee the price hike due to post-purchase policy changes or asymmetrical information, and who cannot turn to substitutes due to high switching costs. *Id.* at 472–77. PhantomALERT has not plausibly alleged that the same is true here.

To see why, consider the facts of *Kodak* itself. There, the photocopier manufacturer implemented various policies to shut out independent repairmen from the aftermarket for servicing Kodak equipment. *Id.* at 458. It decided to only sell replacement parts to purchasers who agreed to use the in-house, Kodak repair service. *Id.* And it coerced manufacturers to stop selling replacement parts to anyone other than Kodak. *Id.* As a result, independent repairmen lost substantial revenue or were shut out of the repair market altogether. *Id.* And consequentially, service prices rose for Kodak customers, who, at the time they bought their equipment, did not realize their repair options would be so limited. *Id.* at 472. So Kodak customers were "locked in" to paying high, unexpected prices for an arguably subpar repair service. *Id.* at 458, 477.

PhantomALERT has not plausibly alleged a *Kodak* aftermarket theory.  First, PhantomALERT does not contend that iPhone users are suffering the type of harm that *Kodak* tried to mitigate.  Apple is not charging a supracompetitive price for the App Store:  it is *free* for Apple users.  *See* Areeda & Hovenkamp, *supra*, at ¶ 564b ("*Kodak* by no means holds that every maker of unique parts for its own product has market power or constitutes a separate market.  The plaintiffs had produced evidence of *discriminatory supracompetitive prices* that were not sufficiently rebutted.") (emphasis added); *United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*, 89 F.3d 233, 237 (5th Cir. 1996) ("Critically, the plaintiffs in *Kodak* produced evidence that Kodak was charging above market prices for its service and was engaging in price discrimination.").  And while the digital age brings unique "costs" to bear beyond those that are merely monetary, PhantomALERT has not claimed that iPhone users are "taxed" by the App Store in some other, nonfinancial way, such as by forking over their data.  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 978 (9th Cir. 2023).

More, there is no allegation that iPhone consumers do not know they will be limited to the App Store when they make their purchase.  *Epic Games*, 67 F.4th at 979 (emphasizing that antitrust plaintiffs alleging a single-brand aftermarket must "produce evidence regarding a lack of consumer knowledge" of the aftermarket restrictions.).  Nor could they have plausibly done so—the App Store has been the exclusive means of downloading apps on the iPhone since 2008.  Amend. Compl. ¶ 12.  In other words, PhantomALERT has alleged neither pre-purchase information asymmetry nor a post-purchase change in policy that engendered consumer lock-in.  But consumer lock-in is the crux of any *Kodak*-style theory.  *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 384 (3d Cir. 2005).

While PhantomALERT alleges that the COVID-19-related revisions to the App Store Guidelines "were not generally known to consumers who purchased iPhones before that date," this assertion is beside the point.  Amend. Compl. ¶ 83.  The requirement of consumer knowledge aims to protect buyers from a particular type of post-purchase bait and switch.  It is to shield consumers from a change in policy that makes the lifecycle price of their good—purchase price, plus the cost of repairs, replacements, and service—unexpectedly more expensive. *Harrison Aire, Inc.*, 423 F.3d at 382; *Epic Games*, 67 F.4th at 977 (citing *Kodak*, 504 U.S. at 477 n.24).

In the wake of such an unforeseen change, consumers cannot select a competitor in the foremarket due to high switching costs.  *Harrison Aire*, 43 F.3d at 382.  So they are trapped paying supracompetitive prices in the defendant's aftermarket.  *Digit. Equip. Corp. v. Uniq Digit. Techs., Inc.*, 73 F.3d 756, 763 (7th Cir. 1996) (noting that the "material dispute" in *Kodak* "was whether the change in policy enabled Kodak to extract supra-competitive prices from customers who had already purchased its machines.").  Thus, an allegation of a mere change in internal policy without any allegation that the lifecycle price of the good has become suddenly more expensive as a result is irrelevant.[3]  Areeda & Hovenkamp, *supra*, ¶ 564b; *Queen City*

---

[3] Perhaps an unexpected change in policy that leads to consumer lock-in is simply one way to plead a *Kodak*-style aftermarket.  *Compare PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir. 1997) ("[A]n antitrust plaintiff cannot succeed on a *Kodak*-type theory when the defendant has not changed its policy after locking-in some of its customers.") *with Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*, 63 F. Supp. 2d 1218, 1230 (E.D. Cal. 1999) (criticizing *Honeywell* and noting that "insist[ing] on a showing of a policy change confuses a symptom of market power and a lack of cross elasticity with the underlying condition itself."); *see also Harrison Aire*, 423 F.3d at 384 (rejecting *Kodak* allegations and noting that "[n]either information costs nor a unilateral change in aftermarket policy" prevented the plaintiff from accurately lifecycle pricing defendant's product in the foremarket when it made its initial purchase).  Here, though, PhantomALERT presents no alternative basis for consumer lock-in— such as high information asymmetry in the foremarket.  Instead, it highlights the change in policy about app requirements.  Amend. Compl. ¶ 83.  While PhantomALERT argues in reply

*Pizza*, 124 F.3d at 440 ("Because [Kodak's] change in policy was not foreseen at the time of sale, buyers had no ability to calculate these higher costs at the time of purchase and incorporate them into their purchase decision.").  The failure to plausibly identify the source of a relevant lock-in takes this case further and further away from *Kodak.*

Finally, PhantomALERT has failed to plausibly plead that iPhone users are prevented from picking Android because of high switching costs.  That is, there have not been any credible assertions that consumers are "locked in" at all.  *Epic Games*, 67 F.4th at 976; *SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 21 (1st Cir. 1999) ("A lock-in phenomenon must be shown, not assumed.").  Instead, PhantomALERT offers only bare assertions that "iPhone users are constrained from switching to [A]ndroid phones for access to apps by virtue of the multiplicity of Apple products and services they use, high switching costs, and resulting 'lock-in' effect."  Amend. Compl. ¶ 82; *see also* Reply Supp. Mot. Amend 18 (asserting "lock-in effect" and "switching costs" without presenting any factual support).  Without more than a rote recitation of the elements, the claim is implausible.  *Accord Freedom Watch,* 368 F. Supp. 3d at 37.  In sum, then, PhantomALERT may not proceed on a *Kodak*-style theory for its alleged aftermarket of the App Store.

That leaves one more possible relevant market:  the "submarket" of "COVID-19-related tracing apps" nestled "[w]ithin the relevant market of the App Store."  Amend. Compl. ¶ 87. PhantomALERT insists that these apps "are not substitutable for other apps, whether or not

---

that "switching costs" create the lock-in effect, *see* Reply Supp. Mot. Amend 17, PhantomALERT does not offer any credible allegations of high switching costs, as discussed below.  So that theory, even if sufficient for a *Kodak* aftermarket, falters.  *See also McBride v. Merrell Dow & Pharms., Inc.*, 800 F.2d 1208, 1211 (D.C. Cir. 1986) ("Considering an argument advanced for the first time in a reply brief . . . is not only unfair to [a defendant], but also entails the risk of an improvident or ill-advised opinion on the legal issues tendered.").

generally health-related, because they performed a specific purpose relating only to COVID-19 tracing and related actions."  Amend. Compl. ¶ 87.  And they are allegedly a submarket of the App Store because "[c]onsumers are constrained from switching from, and locked into, the App Store for accessing such apps."  Amend. Compl. ¶ 87.

PhantomALERT misunderstands the submarket concept.  Product markets exist as a collection of submarkets that themselves are a series of concentric circles.  Areeda & Hovenkamp, *supra*, ¶ 533b ("One might describe the broadest range of substitution as a 'market' and each increasingly narrow grouping as a 'submarket.'").  As the submarket expands, so too does its definition of reasonable interchangeability.  *Id.*  So a broader submarket for a product will include a greater number of substitutes than will a narrower submarket for a product.  *Id.*  But each submarket necessarily contains substitutes for the larger product market—just at varying degrees of attenuation.  *Id.*  As an example, consider the relevant product market to be milk.  The broadest submarket may include products as far-reaching as almond milk to skim milk to half and half.  But narrower submarkets will cull the list of proper substitutes.  So as the submarket contracts, it will only include products highly like defendant's milk—say, pasteurized goat milk.  Whimsy aside, what is important here is that every submarket is wholly included in the larger product market.  Indeed, "a 'submarket' that is not even a smaller grouping within the main market is nonsense."  *Id.* n.4.

That precept defeats PhantomALERT's proposed submarket.  COVID-19-related apps are not reasonably interchangeable for the App Store.  *See F.T.C. v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1037 (D.C. Cir. 2008) (defining reasonable interchangeability as "the desirability" of substituting goods for one another).  If a consumer wished to track his COVID-19 symptoms, he would choose between applications that offered features such as "vaccination reporting, tracking,

tracing, and mapping." Amend. Compl. ¶ 21. He would not be shopping around for a new way to access and download all different types of applications. Thus apps geared towards health are not substitutes for an app distribution marketplace. Nor has PhantomALERT tried to argue as much. So while perhaps tempting to label groups of products within a larger marketplace as a "submarket," to do so is doctrinally incoherent. PhantomALERT's purported "submarket" is thus a nonstarter.

Even if the Court were to disregard this plain misunderstanding, the product market would still fail. Submarkets must be defined in the same terms as broader product markets—that is, by reasonable interchangeability of use or the cross-elasticity of demand. *Brown Shoe*, 370 U.S. at 325. PhantomALERT has failed to plausibly allege why the Court should narrow its gaze to COVID-19-related apps on the App Store. *See* Amend. Compl. ¶ 89 ("Apple anticompetitively maintained its monopoly over access to COVID-19-related apps through the App store."). Instead, it is plausible that apps geared toward the virus are reasonably interchangeable whether they are downloaded by a user on the App Store or accessed by a user on his web browser. *Reilly v. Apple, Inc.*, 578 F. Supp. 3d 1098, 1107 (N.D. Cal. 2022) ("[B]ecause distribution can occur through web apps, by web access, and through other app stores, Plaintiff's failure to address or analyze these plausible alternatives is fatal to his proposed market definition.") (cleaned up). PhantomALERT has also failed to explain why Android COVID-19-related apps are not substitutable, especially as many iPhone users might own Google devices, too. Thus because the Complaint "fails to draw the market's boundaries to encompass the product at issue as well as all economic substitutes for the product," it cannot state a claim for relief here. *Coronavirus*, 85 F.4th at 956 (cleaned up).

Finally, PhantomALERT has failed to plausibly define the geographical limits of its proposed markets.  This failure "provides an adequate and independent" justification for dismissal.  *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 598 (8th Cir. 2009).  While PhantomALERT borrows the DOJ's contentions that the smartphone market is limited to the United States, *see* Amend. Compl. ¶ 16, it never specifies the boundaries of the App Store or COVID-19-related app markets.  The Court is left guessing where consumers of app distribution networks and virus-tracking devices can "practicably turn for supplies."  *Tampa Elec. Co.*, 365 U.S. at 327.  Even if the Court were to assume that PhantomALERT intended the United States to be the relevant geographic market for all its product markets, futility persists.  PhantomALERT does not explain why the Court need only consider App Store users in the United States, when Apple is a global enterprise.  Amend. Compl. ¶ 2.  Likewise, it does not specify why international virus-tracking apps are irrelevant, especially as COVID-19 was not contained to domestic shores.  Amend. Compl. ¶ 21.  Thus because "[t]he plaintiffs have provided no basis on which to justify their proposed geographic market definition," granting leave to amend would be fruitless.  *Concord Assocs., L.P. v. Ent. Properties Tr.*, 817 F.3d 46, 53 (2d Cir. 2016).  The antitrust claims cannot go forward.

**B.**

That leaves one final claim: PhantomALERT's assertion that Apple violated California's Unfair Competition Law.  The UCL prohibits business practices that constitute "unfair competition," which is defined in relevant part as "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  "The broad scope of the statute encompasses both anticompetitive business practices and practices injurious to consumers."  *Chavez v.*

*Whirlpool Corp.*, 93 Cal. App. 4th 363, 374 (2001).  PhantomALERT and its purported class seek injunctive relief under the UCL.[4]  Amend. Compl. ¶ 106.

The problem is, PhantomALERT nowhere pleads the prerequisites to earn injunctive relief.  It does not claim that its injury was "irreparable" or that the damages it seeks "are inadequate to compensate for that injury."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  Nor does it contend that the balance of hardships and the public interest favor the issuance of an injunction.  *Id.*  Federal law on equitable remedies controls on state-law claims in diversity cases.  *Guaranty Tr. Co. of N.Y. v. York*, 326 U.S. 99, 105 (1945); *see also Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 841 (9th Cir. 2020) (holding that federal courts must apply equitable principles derived from federal common law to claims for equitable restitution under California's UCL); *In re MacBook Keyboard Litig.*, 2020 WL 6047253, at *3 (N.D. Cal. Oct. 13, 2020) (holding *Sonner* extends to claims for injunctions under the UCL and collecting cases).

Thus the Court concludes that PhantomALERT has failed to adequately state a claim for injunctive relief.  *Accord Guthrie v. Transamerica Life Ins. Co.*, 561 F. Supp. 3d 869, 875 (N.D. Cal. 2021) ("[A] plaintiff must, at a minimum, plead that she lacks adequate remedies at law if she seeks equitable relief" under California's UCL).  So permitting amendment of PhantomALERT's UCL claim would be futile.  *Cf. New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 31 (D.D.C. 2021), *aff'd sub nom. New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir.

---

[4] California courts have held that "the UCL provides only for equitable remedies." *Hodge v. Superior Court*, 145 Cal. App. 4th 278 (Cal. Ct. App. 2006); *see also Nationwide Biweekly Admin., Inc. v. Superior Court*, 9. Cal. 5th 279, 301 (2020) (concluding that the "causes of action established by the UCL" are "equitable in nature").

2023) (granting motion to dismiss on antitrust claim where plaintiffs failed to plausibly allege entitlement to injunctive relief).

## IV.

To sum up, Apple's motion to dismiss will be granted as unopposed.  Thus PhantomALERT's Complaint will be dismissed without prejudice.  Yet permitting leave to file the Amended Complaint would be futile.  Not one of PhantomALERT's amended claims plausibly states a claim for relief.  So the motion to amend will be denied.

A separate Order will issue today.

Dated: January 10, 2025                          _____
                                                 TREVOR N. McFADDEN, U.S.D.J.